# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 25-cr-225 (PJS/DJF) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Kashmir Khaliffa McReynolds (1), | |
| Defendant. | |

This matter is before the Court on Defendant Kashmir Khaliffa McReynolds' *Motion to Suppress Statements* (ECF No. 42) ("Motion"). The Motion seeks to suppress Mr. McReynolds' statements to police during an interrogation on March 14, 2025 at the Minneapolis Public Service Building. (ECF No. 42 at 2; ECF No. 71 at 1.) Mr. McReynolds challenges the admission of these statements on the ground that he did not validly waive his *Miranda* rights. (ECF No. 71 at 6-9.) The Court held a hearing on Mr. McReynolds' Motion, along with other Motions related to this matter, on November 5, 2025. (ECF No. 64.) During the hearing, the Court received into evidence seven exhibits relevant to this Motion, including recorded phone calls (Gov't Exs. 1-2), body camera footage (Gov't Ex. 3), and a video recording of the interrogation (Gov't Ex. 4). The Court also heard testimony from two witnesses relevant to the Motion: Sergeant Brandon Noble of the Minneapolis Police Department; and Lovely Milon, Mr. McReynolds' significant other. (ECF No. 64 at 11-59; 86-102.) Based on the parties' written submissions, the hearing testimony, and the entire file, the Court recommends Mr. McReynolds' Motion be denied.

## BACKGROUND

Mr. McReynolds worked as armed security for 21 Days of Peace, "a community-violence-intervention initiative of Salem Inc., which is a non-profit based in north Minneapolis." (ECF No.

1 at 1-2.)  On the night of March 10, 2025, Mr. McReynolds and Defendant Alvin Anthony Watkins Jr., another Salem Inc. employee, helped 21 Days of Peace host a community barbecue in North Minneapolis.  (*Id.* at 3.)  At around 9:30 p.m., an unknown person or persons began firing a hail of bullets in Mr. McReynolds' and Mr. Watkins' direction at the barbecue.  (*Id.* at 1, 3.)  Mr. McReynolds was shot in the neck, shoulder, and torso.  (*Id.* at 3; ECF No. 64 at 22, 49.)  After being shot, he lay on the ground and began to fire back with a pistol he had in his possession. (ECF No. 1 at 3.)  Mr. Watkins initially ran away but then ran back.  (*Id.*)  Mr. McReynolds directed Mr. Watkins to get a firearm from Mr. McReynolds' car and load it with ammunition. (*Id.*)  Both men fired their weapons toward the area from where they believed the shots originated. (*Id.* at 5.)  They then got in their cars and fled the scene.  (*Id.*)

Mr. McReynolds went to the emergency room at North Memorial Health Hospital in Robbinsdale, Minnesota, where he was treated for his gunshot wounds.  (Def. Ex. 5 at 7-8.)  After receiving treatment, he was discharged the next day with prescriptions for the following medications: (1.) bacitracin; (2.) hydroxyzine pamoate; (3.) lidocaine; (4.) methocarbomal; (5.) acetaminophen; and (6.) ibuprofen.  (Def. Ex. 5 at 6-7.)  Ms. Milon took care of Mr. McReynolds after his discharge while he recuperated at home.  (ECF No. 64 at 87, 91-92.)  She helped him manage his medications and ensured he took the correct dosages at the correct times.  (*Id.* at 92.)

A few days later, Sergeant Noble called Mr. McReynolds and asked if he would be willing to let Sergeant Noble and his partner, Sergeant Gilles Antaya, come and speak with him in person. (Gov't Ex. 2 at 00:49-59.)  Mr. McReynolds agreed and offered to instead meet them at their office the next day.  (*Id.* at 2:04-18.)  Sergeant Noble said he was amenable to meeting at their office so long as Mr. McReynolds felt able to do so.  (*Id.* at 1:50-57.)  Mr. McReynolds confirmed he was, and they agreed to a time to meet the next morning.  (*Id.* at 2:06-25.)

Mr. McReynolds came to the investigators' offices at the Minneapolis Public Service Building the next morning and met Sergeants Noble and Antaya for the first time. (Gov't Ex. 3 at 00:37-1:00.) After introducing themselves, the sergeants escorted Mr. McReynolds to an interrogation room. (*Id.* at 2:02-25.) Sergeant Antaya purposefully left the door to the room cracked open. (Gov't Ex. 4 at 11:53:54-11:54:01.)

Once they were all seated, Sergeant Antaya told Mr. McReynolds that the purpose of meeting with him was to "get [Mr. McReynolds'] side of the story" and possibly take photos of his injuries. (*Id.* at 11:54:25-40.) Sergeant Antaya also stated that, because Mr. McReynolds fired back at the shooters, the sergeants needed to give him a *Miranda* warning. (*Id.* at 11:55:05-14.) He explained that they needed to do so "in order to make sure everything is formal." (*Id.* at 11:55:14-21.) After administering the warning, Sergeant Antaya asked Mr. McReynolds if he understood it, and Mr. McReynolds replied that he did. (*Id.* at 11:55:26-48.)

Sergeants Antaya and Noble proceeded to question Mr. McReynolds about his and others' phone numbers and addresses, his job, his weapons training, and the night of the shooting. (*Id.* at 11:55:50-1:01:53.) The sergeants also asked Mr. McReynolds about the legal concept of the "duty to retreat," whether Mr. McReynolds understood what that phrase meant, and whether his actions were consistent with his understanding of the duty to retreat. (*Id.* at 1:02:05-1:04:32.) Mr. McReynolds asked the sergeants about the disposition of his property that the police had taken. (*Id.* at 1:04:35-1:05:35.) Afterward, the sergeants asked Mr. McReynolds more questions about his firearms training, engaged in small talk, and took photos of his injuries. (*Id.* at 1:08:50-1:35:36.) Over the course of the hour-and-a-half long conversation, Mr. McReynolds responded to all their questions and asked questions in a coherent manner, demonstrating few problems recalling information. At the end of the interview, the sergeants placed Mr. McReynolds under

arrest for recklessly discharging a firearm. (*Id.* at 1:35:36-1:36:33.)

On June 5, 2025, a federal grand jury indicted Mr. McReynolds on one count of disposing of a firearm to a convicted felon and one count of possession of a firearm while employed for a felon. (ECF No. 1 at 6-7.) The charges are premised on Mr. McReynolds' alleged disposal of a firearm to Mr. Watkins and his professional relationship with Mr. Watkins, who has a felony record. (*Id.*)

**DISCUSSION**

**I.      Legal Standards**

The Fifth Amendment prohibits the government from compelling a criminal defendant to testify against himself. *See* U.S. Const. amend. V. To ensure this right is protected, the Supreme Court created the well-known *Miranda* rule, which requires law enforcement to advise a criminal suspect of certain rights ("*Miranda* rights") prior to any custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 46, 444 (1966). "Once warned, a suspect may waive effectuation of *Miranda* rights." *United States v. Jones*, 23 F.3d 1307, 1313 (8th Cir. 1994). If the suspect validly waives his *Miranda* rights, his statements to the police are admissible at trial. *See United States v. Rooney*, 63 F.4th 1160, (8th Cir. 2023).

The validity of a *Miranda* waiver hinges on "two distinct dimensions": (1.) whether the waiver was voluntary; and (2.) whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "[A] waiver is involuntary if under the totality of the circumstances the defendant's will was overborne." *United States v. Harper*, 466 F.3d at 643 (8th Cir. 2006) (citation modified). Additionally, for a waiver to be deemed involuntary, it must have been the product of undue police coercion. *See United States v. Turner*, 157 F.3d 552, 555

(8th Cir. 1998).  When evaluating awareness, courts "look to the totality of the circumstances to determine whether a suspect had the requisite level of comprehension to knowingly waive his rights." *Harper*, 466 F.3d at 643.  Importantly, this does not mean that a defendant has a right to know all information that may "help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Moran*, 475 U.S. at 422.  Rather, for a *Miranda* waiver to be valid, the defendant needs to have only the "knowledge *essential* to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 424 (emphasis added).

## II.     Analysis

Mr. McReynolds contests the validity of his *Miranda* waiver on the grounds that he was impaired at the time of the interrogation, and the interrogation was the product of deceptive police tactics and coercion.  (ECF No. 71 at 6-9.)  Based on these claims, Mr. McReynolds asserts his waiver was neither voluntary nor made with sufficient awareness of his rights and the consequences of abandoning them.  (ECF No. 71 at 6-9.)

### A.     Awareness

Mr. McReynolds argues he did not knowingly and intelligently waive his *Miranda* rights because he was "under the influence of medication and traumatized from the shooting" at the time of the interrogation.  (ECF No. 71 at 6.)  After reviewing the recorded footage of the interrogation and considering the totality of the circumstances, the Court disagrees.  Though Mr. McReynolds may have been suffering from reduced mental acuity due to his physical injuries, medication, and psychological trauma, he nonetheless acted in a manner that was more consistent with a person who had the capacity to understand his *Miranda* rights than "a person who did not know what he was doing." *Turner*, 157 F.3d at 555; *see also United States v. Osorio*, 110 F.4th 1089, 1099 (8th Cir. 2024).  The video evidence plainly shows that he was lucid, had largely intact memory, and

was capable of coherent thought processes.  He could recall specific people, times, places and events, including: Lovely Milon's date of birth and her new address (Gov't Ex. 4 at 11:58:00-35); the names of individuals at the barbecue where he was shot (*id.* at 11:59:04-30); the hours of his shift that day (*id.* at 12:00:02-09); where he and others were standing when he was shot (*id.* at 12:06:58-12:08:28, 12:11:33-12:12:13); the location, direction, color, make, and model of various vehicles at the event (*id.* at 12:09:17-12:11:33); his thought processes before and after being shot (*id.* at 12:12:27-12:25:35); his salary (*id.* at 12:01:24-42), work hours (*id.* at 12:01:42-52), and terms of employment with 21 Days of Peace (*id.* at 12:01:00-23, 12:01:52-12:03:27, 12:04:08-55); and the name of his own security company (*id.* at 12:03:31-42).  He was also able to explain the events that day and discuss the meaning of the duty to retreat in a coherent and logical manner.

Given his demonstrated mental capabilities, the Court concludes that Mr. McReynolds almost certainly had the wherewithal to intelligently and knowingly waive his *Miranda* rights. Other cases in this circuit are instructive.  In *United States v. Turner*, the defendant's I.Q. was "low-average to borderline range," and when he waived his *Miranda* rights, he was under the influence of phencyclidine ("PCP").  157 F.3d at 554.  Despite his mental impairment and intoxication, the court concluded the defendant's waiver was knowing and intelligent because he was "cooperative, reviewed and initialed each admonition of the [*Miranda*] waiver form, agreed to answer questions, and gave accurate information."  *Id.* at 555.  He also lied to police, which was "more consistent with a person attempting to avoid being caught than a person who did not know what he was doing."  *Id.*  In *United States v. Gaddy*, the Eighth Circuit similarly concluded that the defendant's *Miranda* waiver was valid because he acted in a lucid, coherent, and calm manner even though he had not slept the night before the interrogation, and he had recently consumed alcohol and various medications.  532 F.3d 783, 788 (8th Cir. 2008).  In both these cases, the court

found the defendant had validly waived his *Miranda* rights because his behavior was inconsistent with a person acting in a bizarre or irrational manner and consistent with a person who had the capacity to understand his *Miranda* rights enough to knowingly and intelligently waive them. *See also United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004) (concluding waiver was valid because defendant appeared "sober and in control of his faculties"); *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) (concluding waiver was valid because defendant did not act intoxicated). The same can be said for Mr. McReynolds' behavior here.

Mr. McReynolds' reliance on the *possible* side effects of his medication is also unconvincing for several reasons. First, he fails to present any evidence establishing how severe those side effects may be and how they would impact a person's ability to understand a *Miranda* warning. *Cf. Turner*, 157 F.3d at 552 (defendant presented expert testimony concerning impact of low I.Q. and PCP use on his ability to intelligently and knowingly waive *Miranda* rights). Second, there is little evidence that he actually suffered from these side effects to a debilitating degree. Ms. Millon testified that Mr. McReynolds was not acting as he normally would. (ECF No. 64 at 97.) But neither is she a medical expert, nor does her testimony demonstrate that Mr. McReynolds was acting so abnormally that he was incapable of understanding his *Miranda* rights or the implications of waiving them. On the contrary, the video recording of the interrogation shows Mr. McReynolds acting in a rational and coherent manner. For these reasons, the Court concludes that Mr. McReynolds knowingly and intelligently waived his *Miranda* rights.

### B.    Voluntariness

Mr. McReynolds also contends his waiver was ineffectual because it was involuntary. (ECF No. 71 at 8.) His argument is premised on the following alleged circumstances: (1.) his physically and mentally impaired condition; (2.) the small confines of the interrogation room; and

(3.) the police "misleading" him by telling him the *Miranda* warning was a mere formality and that the purpose of the interrogation was to "hear his side of the story." (ECF No. 71 at 8.) The Court is unpersuaded. As previously stated, the video evidence shows Mr. McReynolds' condition was not nearly as compromised as he suggests. He appeared fully capable of understanding the meaning of the *Miranda* warning the investigators read to him. The small size of the interrogation room can be described as mildly coercive *at most*, and whatever effect it may have had was mitigated by the fact that the investigators purposefully left the door open. *See United States v. Hatten*, 68 F.3d 257, 262 (8th Cir. 1995) (concluding defendant's placement in a "small basement interview-room" was not "compelling or coercive"); *United States v. McNeary*, No. 21-cr-128 (JMB/LIB), 2024 WL 639471, at *2 (D. Minn. Feb. 15, 2024) ("Moreover, the atmosphere was not coercive because although the interview room was not a large room, there were never more than two officers in the room with [defendant], and the door to the room remained open at all times").

The Court is also unpersuaded that the officers' tactics were so deceptive as to render Mr. McReynolds' *Miranda* waiver involuntary. The use of deception to secure a waiver does not necessarily invalidate it. *See Colorado v. Spring*, 479 U.S. 564, 576 (1987) (concluding police use of "trickery" does not necessarily render a waiver invalid when the suspect is given a *Miranda* warning and understands his *Miranda* rights); *United States v. Farley*, 607 F.3d 1294, 1330 (11th Cir. 2010) (rejecting argument that deception alone is adequate to render *Miranda* waiver invalid). Deception invalidates a waiver only if it causes a defendant's will to be overborne or undermines his ability to understand his *Miranda* rights. *See Harper*, 466 F.3d at 643; *see also United States v. Carpentino*, 948 F.3d 10, 29 (1st Cir. 2020) ("[E]ven 'the use of chicanery does not automatically undermine the voluntariness' of a *Miranda* waiver.").

As a threshold matter, the officers' representations that they wanted to hear Mr. McReynolds' side of the story were not untrue, because they were interrogating him for the purpose of collecting his statements. Though they may have had other, unstated motives or purposes (*see* ECF No. 64 at 14-17), their states of mind are "irrelevant to the question of the intelligence and voluntariness of [Mr. McReynolds'] election to abandon his rights." *Moran*, 475 U.S. at 423. Additionally, the investigators' insinuation that Mr. McReynolds was being questioned as a crime victim, and that the *Miranda* warning was a mere "formality", did not interfere with his ability to understand the meaning of his *Miranda* rights as stated in the warning or his ability to exercise them at any time during the interrogation. *Compare United States v. Lincoln*, No. 19-cr-6047 (CJS/MWP), 2019 WL 7198227, at *11 (W.D.N.Y. Dec. 23, 2019) (concluding waiver was not unknowing or involuntary even though police told defendant *Miranda* warning was a formality) and *United States v. Chapman*, No. 2:20-cr-91 (JCM/DJS), 2024 WL 2051678, at *4 (D. Nev. Mar. 6, 2024) (same) *with United States v. Castor*, 598 Fed. App'x 700, 702-703 (11th Cir. 2015) (finding *Miranda* waiver involuntary because police officer told defendant his statements would not be used against him at trial). Mr. McReynolds' own failure to appreciate that he could be both a victim and a suspect, or that waiving his rights may have been unwise, does not mean his waiver was involuntary. *See Spring*, 479 U.S. at 576 (stating *Miranda* waiver is not invalid because defendant lacked information affecting "only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature").

Moreover, the environment was not otherwise coercive. The investigators never used threats or intimidation to secure his waiver. On the contrary, they acted professionally and cordially. *See United States v. Galtney*, No. 19-cr-332 (MJD/BRT), 2022 WL 18587745, at *6 (D. Minn. Oct. 21, 2022) (citing *United States v. Mims*, 567 F. Supp. 2d 1059, 1080 (D. Minn.

2008) (finding *Miranda* waiver was voluntary, partly because tone of interrogation was "cordial and professional").  Mr. McReynolds was not under arrest when he waived his *Miranda* rights, and he came to the police station voluntarily, even if he did so under the mistaken belief that he was not under any threat of prosecution.  *See Perry v. Kemna*, 356 F.3d 880, 886 (8th Cir. 2004) (concluding *Miranda* waivers were voluntary in part because defendant came to police station voluntarily for interviews).  Given all these circumstances, the Court concludes that Mr. McReynolds' *Miranda* waiver was "the product of a free and deliberate choice," not unlawful coercion.  *Moran*, 475 U.S. at 421.

For all the above reasons, the Court concludes Mr. McReynolds' statements followed a knowing and voluntary waiver of his *Miranda* rights.  The Court accordingly recommends that the Motion be denied.

## RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Kashmir Khaliffa McReynolds' *Motion to Suppress Statements* (ECF No. 42) be **DENIED**.

Dated:  April 6, 2026                    *s/ Dulce J. Foster*
                                         Dulce J. Foster
                                         United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).